110 T.C. No. 1


UNITED STATES TAX COURT


GORDON J. AND BONNIE L. SCHOOF, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4265-96,  6210-96,    Filed January 12, 1998.
            6394-96,  6617-96,
            6761-96,  7632-96,
            9362-96,  9490-96,
           15341-96, 15342-96,
           17606-96, 17607-96.

     T, an individual, sought approval from the Internal
Revenue Service to become a trustee of an individual
retirement account (IRA) trust. During 1991,
distributions out of individual retirement plans were
made to Ps. Those distributions were then rolled over to

---

[1]    Cases of the following petitioners are consolidated
herewith: Lyman K. and Judith Kennedy, docket No. 6210-96; Melvin
L. and Gail H. Rush, docket No. 6394-96; Alice M. Johnson, docket
No. 6617-96; Robert J. and Bette Barraclough, docket No. 6761-96;
William N. and Joan E. Hughes, docket No. 7632-96; William W. and
Joan E. Agnew, docket No. 9362-96; Joe O. and Daurine M. Baker,
docket No. 9490-96; Joseph P. and Genice Spetz, docket No. 15341-
96; Robert C. and Mary D. Borman, docket No. 15342-96; Nurit
Haramgaal, docket No. 17606-96; and John S. Husmann and Elinor C.
MacKinnon, docket No. 17607-96.

the IRA trusts of which T was to be the trustee. Concurrently therewith each of the IRA trusts acquired a unit(s) (or fraction thereof) in an investment in a bus stop shelter program.

1. Held:  T is not qualified to serve as a trustee of an IRA trust under sec. 408(a)(2), I.R.C., and sec. 1.408-2(b)(2), Income Tax Regs.

2. Held, further, the distributions to Ps were taxable in the year of distribution and were subject to the 10-percent additional tax pursuant to sec. 72(t), I.R.C.

3. Held, further, under Wood v. Commissioner, 93 T.C. 114 (1989), Ps did not substantially comply with the rollover contribution requirements of sec. 408(d), I.R.C., so as to exclude the distributions from income.

Stephen M. Goodman, for petitioners.

Lisa W. Kuo, for respondent.

JACOBS, Judge:  Respondent determined deficiencies in petitioners' 1991 Federal income tax as follows:

| Docket No. | Petitioner(s) | Deficiency |
| --- | --- | --- |
| 4265-96 | Gordon J. and Bonnie L. Schoof | $24,605 |
| 6210-96 | Lyman K. and Judith Kennedy | 4,112 |
| 6394-96 | Melvin L. and Gail H. Rush | 8,706 |
| 6617-96 | Alice M. Johnson[1] | 7,397 |
| 6761-96 | Robert J. and Bette Barraclough | 10,764 |
| 7632-96 | William N. and Joan E. Hughes | 128,225 |
| 9362-96 | William W. and Joan E. Agnew | 46,533 |

| 9490-96 | Joe O. and Daurine M. Baker | 3,002 |
| 15341-96 | Joseph P. and Genice Spetz | 8,724 |
| 15342-96 | Robert C. and Mary D. Borman | 16,462 |
| 17606-96 | Nurit Haramgaal | 11,405 |
| 17607-96 | John S. Husmann and Elinor C. MacKinnon | 4,606 |

[1] A notice of deficiency was issued to Alice M. Johnson and her husband Duaine E. Johnson. Mr. Johnson died on Sept. 1, 1994. An estate was not opened for him. Alice M. Johnson, as surviving spouse, is the sole petitioner in docket No. 6617-96.

Each of these 12 consolidated cases involves the following transactions: (a) A distribution from an individual retirement plan, (b) an attempted tax-free rollover contribution of that distribution to a newly established putative individual retirement account trust, and (c) a purchase of a unit(s) (or fraction thereof) in a bus stop shelter program. The issue for decision is whether the rollover qualifies for tax-free treatment. Resolution of this issue depends in part upon whether the trustee of the putative individual retirement account trust is an eligible trustee.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                         FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

At the time the petitions were filed, the following petitioners resided in California: Gordon J. and Bonnie L. Schoof; Lyman K. and Judith Kennedy; Alice M. Johnson; William N. and Joan E. Hughes; Joseph P. and Genice Spetz; Robert C. and Mary D. Borman; Nurit Haramgaal; and John S. Husmann and Elinor C. MacKinnon. Melvin L. and Gail H. Rush resided in Colorado; Robert J. and Bette Barraclough resided in Texas; William W. and Joan E. Agnew resided in Massachusetts; and Joe O. and Daurine M. Baker resided in Nebraska.

Bus Stop Shelter Investments

In 1984, Jean Claude LeRoyer founded Metro Display Advertising, Inc. (MDA), doing business as Bustop Shelters of California, Inc.[2] MDA manufactured, installed, and sold shelters which were situated at bus stops to protect riders from inclement weather while they waited for their bus. The shelters were constructed of aluminum and safety tempered glass or lexan; the shelters' components were modular in design to make replacement inexpensive and fast. The shelters were mounted in concrete and lit at night. Each shelter contained space behind the glass or lexan to place advertisements, and MDA generated revenue by leasing the advertising display space on the shelters.

---

[2] Metro Display Advertising, Inc., filed for bankruptcy in 1992.

Between 1984 and 1992, MDA offered investments in bus stop shelters (hereinafter referred to as the bus stop shelter program).[3] Each bus stop shelter was referred to as a bus stop shelter unit. Through the bus stop shelter program, investors entered into a purchase agreement with MDA pursuant to which the investor acquired a bus stop shelter unit for $10,000. Upon the purchase of the bus stop shelter unit, the investor had the option to either lease the bus stop shelter to MDA or independently operate and maintain the shelter.

If the investor chose to lease the bus stop shelter to MDA, the investor was required to enter into two agreements: An equipment lease agreement and a maintenance agreement. Pursuant to the terms of these agreements, MDA agreed to: (1) Pay the investor $200 per month (less $30 per month for maintenance costs); (2) maintain, operate, and assemble the shelter; and (3) maintain insurance for the shelter.

Upon the expiration of the agreements, MDA agreed (pursuant to a buyback agreement) that it would repurchase the bus stop shelter from the investor for $10,000 or its fair market value, whichever was higher.

---

[3] By using the term "shelter" we do not mean to suggest or decide that the investments herein were "tax shelters" as that term is understood.

FAC Individual Retirement Account

Donald L. Thomson was one of several individuals who actively sold bus stop shelter units as part of MDA's bus stop shelter program. Mr. Thomson was a financial planner and accountant who did business as Financial & Accounting Consultants, Inc. (FAC). Despite its name, FAC was a sole proprietorship and not a corporation.

During the late 1980's, Mr. Thomson sought approval from the Internal Revenue Service (IRS) to become a trustee of an individual retirement account (IRA) trust that ultimately would make an investment in MDA's bus stop shelter program (the FAC IRA).

Mr. Thomson prepared a FAC IRA disclosure statement which was delivered to all prospective investors in the FAC IRA. The disclosure statement stated:

> The Trust is established with the intent that it qualify as an "Individual Retirement Account" under Section 408(a) of the Code, and the provisions hereof shall be construed in accordance with such intent. * * *

> The Trust was last approved as an acceptable form of prototype trust under Section 408(a) of the Internal Revenue Code by the National Office of the Internal Revenue Service (IRS) in Opinion Letter Serial No. B111447b dated March 27, 1987.

Upon opening the FAC IRA, the investor executed an IRA adoption agreement. The adoption agreement authorized FAC to invest the IRA contributions in MDA's bus stop shelter program and to open a

custodial account at the El Dorado Bank in Newport Beach, California, to collect the rental income generated from the lease agreements entered into with MDA.

Mr. Thomson executed a Form 56 (Notice Concerning Fiduciary Relationship) with respect to each investor in the FAC IRA. Both Mr. Thomson and each investor in the FAC IRA executed a Form 5305-A (Individual Retirement Custodial Account) assigning the IRA contributions to the custodial account.

Petitioners' Investments in the FAC IRA

All petitioners in this case caused distributions to be made out of existing qualified IRA's (and in one instance an existing qualified IRA and a pension plan[4]) for the purpose of rolling over the distribution into the FAC IRA. The distributions and contributions into the FAC IRA were as follows:

| Petitioner | Distribution from IRA/ Pension Plan | Date | Contribution to FAC IRA | Date |
|---|---|---|---|---|
| Gordon J. Schoof | $62,151.00 | [1]02/05/91 | $65,000.00 | 02/07/91 |
| | 3,579.77 | 02/07/91 | | |
| Bonnie L. Schoof | 7,397.69 | 08/16/91 | 20,000.00 | 09/04/91 |
| | 10,709.06 | 08/26/91 | | |
| Lyman K. Kennedy | 5,000.00 | 04/18/91 | 5,000.00 | 04/24/91 |
| Judith Kennedy | 5,000.00 | 04/18/91 | 5,000.00 | 04/24/91 |

---

[4] Only petitioner Nurit Haramgaal caused a distribution to be made from a pension plan.

| Name | Distribution | Date | Contribution | Date |
|---|---|---|---|---|
| Melvin L. Rush | 81,059.51 | 02/14/91 | [2]20,000.00 | 02/14/91 |
| Alice M. Johnson[3] | 25,969.82 | [1,4]1991 | 25,000.00 | 11/19/91 |
| Robert J. Barraclough | 10,000.00 | [4]1991 | 10,000.00 | 06/25/91 |
| Bette Barraclough | 10,000.00 | [4]1991 | 10,000.00 | 06/25/91 |
| William N. Hughes | 306,860.10 | 02/14/91 | 305,000.00 | 02/14/91 |
| William W. Agnew | [5]202,500.00 | [1]07/31/91 | 200,000.00 | 08/01/91 |
| Joe O. Baker | 10,000.00 | [1]08/23/91 | 10,000.00 | 08/23/91 |
| Daurine M. Baker | 10,000.00 | [1]08/23/91 | 10,000.00 | 08/23/91 |
| Joseph P. Spetz | 14,166.54 | 07/23/91 | 20,000.00 | 07/23/91 |
|  | 3,500.74 | 07/23/91 |  |  |
| Robert C. Borman[6] | 46,412.00 | 03/06/91 | 45,000.00 | 02/27/91 |
| Nurit Haramgall | 19,223.50 | 01/31/91 | 30,000.00 | 05/02/91 |
|  | 9,852.17 | 04/11/91 |  |  |
| John S. Husmann | 5,284.90 | 01/04/91 | 5,000.00 | 01/07/91 |
| Elinor C. MacKinnon | 4,191.02 | 03/11/91 | 5,000.00 | 04/06/91 |

[1]  Petitioners were age 59-1/2 or older at the time of the distributions.

[2]  The balance of the distribution was rolled over into an unrelated individual retirement account.

[3]  The distribution and contribution were made by petitioner's husband.

[4]  The exact dates of distribution in 1991 are unknown.

[5]  Petitioners William W. and Joan E. Agnew reported $2,500 of the distribution as taxable in 1991.

[6] There is no explanation in the record as to why petitioner's distribution occurred after the date of the rollover contribution to the FAC IRA.

All petitioners made their contributions to the FAC IRA by writing checks made payable to "Bustop Shelters Co. of California,

Inc.", or some variation of that name. None of the investors made their checks payable to the FAC IRA or Mr. Thomson as trustee. All petitioners, other than Joe O. and Daurine M. Baker, contributed to the FAC IRA by writing checks drawn on their personal checking accounts. Petitioners Joe O. and Daurine M. Baker caused the trustee of their existing IRA's to issue cashier's checks.

After investing in the FAC IRA, all petitioners executed purchase, lease, maintenance, and buyback agreements with MDA and executed an IRA adoption agreement with FAC. Mr. Thomson executed a Form 56 with respect to each petitioner. Mr. Thomson and each petitioner executed a Form 5305-A.

The rents generated by the bus stop shelter units were deposited into the El Dorado Bank custodial accounts. The bus stop shelter units were held in the FAC IRA trust.

None of petitioners reported the distributions from their IRA's (and in the case of Nurit Haramgaal, she did not report the distribution from her IRA and pension plan) as a taxable event on their 1991 Federal income tax returns.

In the respective notices of deficiency to petitioners, respondent determined that the IRA and pension plan distributions were taxable events on the predicate that petitioners did not properly roll over the distributions into qualified IRA's. Respondent also determined that each petitioner was liable for a

10-percent additional tax pursuant to section 72(t) for early distributions from qualified retirements plans.[5]

OPINION

Generally, distributions from qualified retirement plans are includable in the distributee's income in the year of distribution as provided in section 72. Secs. 402(a)(1), 408(d)(1). An exception exists if the distribution proceeds are rolled over into an eligible retirement plan or an IRA within 60 days of the distribution. Secs. 402(a)(5), 408(d)(3).

In the consolidated cases before us, respondent contends that petitioners' distribution proceeds were not rolled over into a qualified IRA because the purported trustee of the FAC IRA, Mr. Thomson, was not eligible to serve in that capacity. Respondent also asserts that petitioners did not acquire their interests in MDA's bus stop shelter program through an IRA but rather in their

---

[5] Respondent concedes on brief that petitioners Gordon J. Schoof, Alice M. Johnson, William W. Agnew, and Daurine M. Baker are not liable for the 10-percent additional tax pursuant to sec. 72(t) for the distributions made to them during 1991 because they were age 59-1/2 or older at the time of the distributions. See sec. 72(t)(2)(A)(i). Because petitioner Joe O. Baker was also age 59-1/2 or older at the time of his distribution, we hold that he is not liable for the sec. 72(t) additional tax.

In the notice of deficiency, there was no determination that petitioners Robert C. and Mary D. Borman were liable for the sec. 72(t) additional tax, but on brief, respondent made such an assertion. See sec. 6214(c).

own names.[6]  We need not, and do not, address this latter issue because we hold that the failure of Mr. Thomson to qualify as a trustee requires all of petitioners' distributions to be included in their income for 1991.

The term "individual retirement account" is defined in section 408(a) as:

> a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:
>
> *       *       *       *       *       *       *
>
> (2) The trustee is a bank (as defined in subsection (n)) or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.

See also Orzechowski v. Commissioner, 69 T.C. 750, 754-755 (1978), affd. 592 F.2d 677 (2d Cir. 1979).

---

[6]     Respondent also asserts that petitioners Alice M. Johnson, Robert J. Barraclough, Bette Barraclough, and Nurit Haramgaal failed to rollover their distributions into the FAC IRA within 60 days.  Because we hold that the rollovers do not qualify for tax-free treatment, we need not address this issue. Nonetheless, we are mindful that Mrs. Johnson and the Barracloughs did not establish the date of their IRA distributions, and that Ms. Haramgaal's May 2, 1991, contribution was more than 60 days from her Jan. 31, 1991, pension plan distribution.

Obviously neither Mr. Thomson nor FAC was a bank; thus, we are concerned only with whether Mr. Thomson may be deemed "such other person" who could serve as a trustee for an IRA trust.

The regulations set forth extensive requirements in order for a person to qualify as a nonbank trustee for an IRA trust. In this respect, the prospective trustee must apply in writing to the Commissioner and prove that the requirements provided in the regulations are satisfied. Sec. 1.408-2(b)(2), Income Tax Regs. The applicant must demonstrate: (1) Its ability to act within the accepted rules of fiduciary conduct; (2) its experience and competence with respect to accounting for the interests of a large number of individuals (including calculating and allocating income earned and paying out distributions to payees); (3) its experience and competence with respect to other activities normally associated with the handling of retirement funds; (4) the existence of procedures for administering fiduciary powers and for the proper auditing and investing of the funds; and (5) other evidence of the applicant's ability to act as a trustee for an IRA. Secs. 1.401-12(n), 1.408-2(b)(2)(ii), Income Tax Regs.[7]

---

[7] Sec. 1.408-2(b), Income Tax Regs., provides that the qualification of nonbank trustees is governed by the regulations under sec. 401(d)(1). Par. (n) of sec. 1.401-12, Income Tax Regs., which applies to nonbank trustees of pension and profit sharing plans, was redesignated as par. (e) of sec. 1.408-2,

(continued...)

These stringent requirements derive from the concern by Congress with regard to the trustee's ability to manage and invest retirement funds and the trustee's accountability for its actions. H. Rept. 93-779, at 132 (1974), 1974-3 C.B. 244, 375. One of Congress' apparent concerns with respect to the trustee's accountability was the continuity of the trustee beyond the death or change of the trustee's owner. The applicable House report stated: "It is anticipated that the Secretary probably will not allow individuals to act as trustees for individual retirement accounts." Id. Consequently, section 1.401-12(n)(3)(i), Income Tax Regs., provides:

> The applicant must assure the uninterrupted performance of its fiduciary duties notwithstanding the death or change of its owners. Thus, for example, there must be sufficient diversity in the ownership of the applicant to ensure that the death or change of its owners will not interrupt the conduct of its business. Therefore, the applicant cannot be an individual.

Mr. Thomson operated his business affairs as a sole proprietor through FAC. As an individual, he was not eligible to serve as a trustee for an IRA trust.

Nonetheless, Mr. Thomson testified that he submitted a written application to the IRS in May 1986 and received approval by letter

---

[7](...continued)
Income Tax Regs., effective Dec. 20, 1995. T.D. 8635, 1996-1 C.B. 52.

from the IRS office in Washington, D.C., dated March 27, 1987, to act as a trustee for the FAC IRA trust. This is the same date reported by Mr. Thomson in FAC's IRA disclosure statement (given to all prospective investors) in which he claims the IRA trust format was approved by the IRS.

Respondent produced a letter from his Washington, D.C., office with the same serial No. (B111447b) and date (March 27, 1987) as that reported by Mr. Thomson in his disclosure statement. The letter is addressed to "MFS Financial Service Inc" (MFS) of Boston, Massachusetts, and states in part:

> In our opinion, the amendment to the form of the prototype trust, custodial account or annuity contract identified above does not adversely affect its acceptability under section 408 of the Internal Revenue Code.

> Each individual who adopts this approved plan will be considered to have a retirement savings program that satisfies the requirements of Code section 408, provided they follow the terms of the program and do not engage in certain transactions specified in Code section 408(e). Please provide a copy of this letter to each person affected.

The Commissioner's letter, despite Mr. Thomson's belief to the contrary, does not indicate that he was approved by the Commissioner to serve as a trustee for the FAC IRA. The letter refers to an amendment to the form of a trust, see Rev. Proc. 87-50, 1987-2 C.B. 647, 648, not to the approval of a trustee to serve in that capacity. Moreover, the letter was addressed to MFS of

Boston, Massachusetts, and not to Mr. Thomson or FAC, which is located in Newport Beach, California. (Mr. Thomson did not establish any relationship between MFS and himself or FAC.) Consequently, we hold that Mr. Thomson was not eligible to serve as a trustee to the FAC IRA trust.

We next consider the consequences of the distributions out of individual retirement plans to petitioners and the subsequent rollover of those distributions to a purported IRA trust with an unqualified trustee. Respondent asserts that the disqualification of Mr. Thomson requires such distributions to be included in petitioners' income. Petitioners assert that so long as they substantially complied with the statutory rollover contribution requirements, they are entitled to exclude the distributions from income. We agree with respondent.

In Fazi v. Commissioner, 102 T.C. 695 (1994), we addressed the issue of whether the failure to adopt a formal written plan for the establishment of an employer retirement plan was fatal to the qualification of the plan, thus causing the distributions from that plan to be includable in income. (Section 1.401-1(a)(2), Income Tax Regs., requires a definite written program and arrangement which is communicated to the employees. See also Employee Retirement Income Security Act of 1974, Pub. L. 93-406, sec. 102(a)(1), 88 Stat. 829, 841.) We held in Fazi that the regulatory

requirement of a written plan that is communicated to employees would have no meaning if the employer did not prepare a written plan to which it (the employer) was contractually bound. Fazi v. Commissioner, supra at 704. "An unexecuted and unadopted plan would be of no comfort to employees who might have to rely upon the terms of a plan for their future security." Id.

IRA trusts were created by Congress to provide retirement savings opportunities to employees whose employers did not provide qualified retirement plans. H. Rept. 93-779, supra at 124-125, 1974-3 C.B. at 367-368. The same concern as to employer retirement plans, namely the beneficiary's future security, is at the heart of the IRA trust arrangement. Consequently, a trustee who has the capacity to administer the trust in a manner that is consistent with the purpose of a retirement account is critical to the qualification of an IRA trust. An individual, per se, does not have such capacity because of the lack of continuity in case of his or her death. As a result, the lack of a qualified trustee is fatal to the existence of a qualified IRA trust under section 408(a).

The substantial compliance doctrine, which petitioners request we apply to their situation, is not applicable to the situation herein. In Wood v. Commissioner, 93 T.C. 114 (1989), a taxpayer sought to roll over the proceeds from a profit-sharing plan into an

IRA.   The taxpayer properly executed the transaction within the required 60-day period, but the trustee mistakenly recorded a part of the proceeds as having been transferred to a non-tax-deferred account.  We therein found that the taxpayer did everything reasonably expected to comply with the statutory rollover contribution requirements, including meeting with his IRA trustee, instructing the trustee to open an IRA, executing the documents to open the IRA, and transferring the distribution to the trustee for deposit in the IRA.   Moreover, the trustee assured the taxpayer that the rollover transaction would be carried out.   We held in Wood that the trustee's bookkeeping error did not preclude rollover treatment because the taxpayer had substantially complied with the statutory requirements.

The facts herein are distinguishable from those in Wood v. Commissioner, supra.   The present case involves the failure of a fundamental element of the statutory requirements for an IRA rollover contribution, namely the qualification of the IRA trustee; whereas Wood v. Commissioner, supra, involved procedural defects in the execution of the rollover.

> Where the requirements of a statute relate to the substance or essence of the statute, they must be rigidly observed.  On the other hand, if the requirements are procedural or directory in that they do not go to the essence of the thing to be done, but rather are given with a view to the orderly conduct of business, they may

> be fulfilled by substantial compliance. [Citations omitted.]

Rodoni v. Commissioner, 105 T.C. 29, 38-39 (1995); see also Taylor v. Commissioner, 67 T.C. 1071, 1077-1078 (1977).

The present case is more like Rodoni v. Commissioner, supra, wherein we held to be fatal the failure to rollover distributions from a profit sharing plan to an IRA for the same person from whose plan the distributions were made. That type of error related to the essence of the statute in that case.

Here, petitioners did not substantially comply with the requirements of rolling over their distributions into an IRA under section 408(a). Although we are sympathetic to petitioners' plight, we hold the distributions out of qualified IRA's to petitioners (in the case of petitioner Nurit Haramgaal, the distributions out of her qualified IRA and pension plan) are includable in petitioners' 1991 income.

Section 72(t) imposes a 10-percent additional tax on premature distributions from retirement plans. Exceptions exist as provided under section 72(t)(2), including distributions made on or after the date the recipient reaches the age of 59-1/2. Sec. 72(t)(2)(A)(i). Petitioners, other than Gordon J. Schoof, William W. Agnew, Alice M. Johnson, Joe O. Baker, and Daurine M. Baker, are liable for the 10-percent additional tax because the record does

not show that they came within any of the exceptions to the tax under section 72(t)(2).

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered under Rule 155</u>.